NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

MELANEY L., *Appellant*,

*v.*

DEPARTMENT OF CHILD SAFETY, S.M., F.M., *Appellees*.

No. 1 CA-JV 21-0034
FILED 9-23-2021

Appeal from the Superior Court in Maricopa County
No. JD532707
The Honorable Jennifer E. Green, Judge

**AFFIRMED**

COUNSEL

Maricopa County Legal Defender's Office, Phoenix
By Jamie R. Heller
*Counsel for Appellant*

Arizona Attorney General's Office, Phoenix
By Emily M. Stokes
*Counsel for Appellee*

**MEMORANDUM DECISION**

Judge Brian Y. Furuya delivered the decision of the Court, in which Presiding Judge Randall M. Howe and Judge Michael J. Brown joined.

**F U R U Y A**, Judge:

¶1        Melaney L. ("Mother") appeals the superior court's order terminating her parental rights to her two oldest children. For the following reasons, we affirm.

**FACTS AND PROCEDURAL HISTORY**

¶2        Between 2005 and 2018, the Department of Child Safety ("DCS") received five reports that Mother had abused substances, including methamphetamine and marijuana, and failed to protect her children from abuse and domestic violence. DCS was unable to substantiate the reports. In May 2019, Mother and Richard M. ("Boyfriend") were residing with thirteen-year-old S.M. and twelve-year-old F.M. in a hotel room when DCS investigated a domestic-violence incident between Mother and Boyfriend. There, in the presence of the children, Boyfriend grabbed Mother by her hair, threw her on the bed, punched her in the face, and held a knife to her throat. He confined Mother like that for two and a half hours until one of the children sought help and police arrived.

¶3        Police found methamphetamine and a syringe in Boyfriend's possession and a glass pipe with black residue in the couple's bed. Although Mother declined to press charges against Boyfriend, police arrested him for aggravated assault, kidnapping, dangerous drug possession, paraphernalia possession, and an outstanding warrant. DCS arrived, and the children told the investigator that Boyfriend had been violent with Mother in the past and had kept drugs in the bathroom. They also said that Mother had recently made statements about harming herself and had engaged in other violent relationships in the past.

¶4        Mother agreed to engage in drug testing and other services as well as to obtain an order of protection against Boyfriend. Accordingly, DCS implemented a safety plan that allowed the children to remain in Mother's care and required the children's maternal grandmother to supervise all contact between Mother and the children. But, according to DCS, Mother did not submit to drug testing or obtain an order of protection,

and in the presence of the children, she twice used a speakerphone to talk to Boyfriend while he was in jail. Therefore, in July 2019, DCS placed the children in the physical custody of their maternal grandmother and filed a dependency petition. The superior court later found the children dependent and set a case plan of family reunification.

¶5        From the beginning of the dependency, DCS provided Mother substance-abuse testing and treatment and supervised visitation. Because Mother told DCS that she had medical insurance, the case manager also asked her to self-refer for domestic-violence counseling. Through the first year of the dependency, however, Mother's engagement in services was inconsistent, and she did not begin counseling. She submitted only a few drug tests in early 2020; one returned positive for marijuana and another for methamphetamine. DCS referred Mother twice for substance-abuse treatment, but the referrals closed because she failed to engage. Regarding visitation, Mother engaged in her second supervised visit referral, so DCS referred her for a parent aide in March 2020. Between March and July 2020, however, Mother maintained only minimal contact with DCS and did not follow through with her parent-aide service. DCS later learned that Mother was homeless around this time.

¶6        As such, the court changed the case plan to termination and adoption, and DCS moved to terminate Mother's parental rights under neglect, substance abuse, and nine-month out-of-home placement grounds. *See* Ariz. Rev. Stat. ("A.R.S.") § 8-533(B)(2), (B)(3), and (B)(8)(a). Soon afterwards, Mother resumed contact with DCS. She informed DCS that she had been residing in a sober-living home since June 2020 and had enrolled in an intensive outpatient substance-abuse treatment program. Mother also consistently tested negative for drugs beginning in July 2020 and obtained employment as a medical technician.

¶7        In September 2020, Mother completed her intensive outpatient substance-abuse program and then began a standard outpatient program. A few weeks later, the case manager reminded Mother that she was required to participate in domestic-violence counseling. Although Mother scheduled an intake for domestic-violence counseling through A New Leaf, she did not attend it. According to Mother, A New Leaf would not accept her insurance. Instead, in October, Mother began individual counseling through her substance-abuse program; according to her therapist, the therapy aimed to address her "substance abuse and anxiety disorder," "address her past trauma," and "cover what [is] going on in her life and how she can cope and make better decisions." That same month, Mother completed a psychiatric evaluation. The psychiatrist diagnosed

Mother with an adjustment disorder with anxiety and a severe substance-abuse disorder in early remission.

¶8        In November 2020, DCS amended its termination motion to include the fifteen-months' time in out-of-home placement ground. *See* A.R.S. § 8-533(B)(8)(c). By this time, Mother had established over five months of sobriety and was consistently attending her standard outpatient drug program. She continued to maintain employment and was still living at the sober-living facility, though that facility did not accept children. Based on Mother's participation in services and establishment of five months of sobriety, DCS withdrew its allegation of substance abuse. Additionally, Mother was consistently participating in her parent-aide service. Regarding counseling, however, Mother had completed only two individual sessions with her TERROS counselor by December 2020.

¶9        Later, the court held an evidentiary hearing and ultimately terminated Mother's parental rights on the neglect and fifteen-months' time in out-of-home placement grounds. Mother timely appealed, and we have jurisdiction pursuant to A.R.S. § 8-235(A) and Arizona Rule of Procedure for the Juvenile Court 103(A).

## DISCUSSION

¶10        Mother challenges the superior court's order terminating her parental rights under the fifteen-months' time in out-of-home placement ground, including its findings that DCS made diligent efforts to promote reunification and that termination of her parental rights was in the children's best interests.

¶11        A parent's right to custody and control of her own child, while fundamental, is not absolute. *Michael J. v. Ariz. Dep't of Econ. Sec.*, 196 Ariz. 246, 248–49, ¶¶ 11–12 (2000). Termination of a parental relationship may be warranted where the state proves one statutory ground under A.R.S. § 8-533 by "clear and convincing evidence." *Id.* "Clear and convincing" means the grounds for termination are "highly probable or reasonably certain." *Kent K. v. Bobby M.*, 210 Ariz. 279, 284–85, ¶ 25 (2005). The court must also find that termination is in the child's best interest by a preponderance of the evidence. *Id.* at 285, ¶ 41.

¶12        We "will accept the juvenile court's findings of fact unless no reasonable evidence supports those findings, and we will affirm a severance order unless it is clearly erroneous." *Jesus M. v. Ariz. Dep't of Econ. Sec.*, 203 Ariz. 278, 280, ¶ 4 (App. 2002). We do not reweigh the evidence, but "look only to determine if there is evidence to sustain the court's

ruling." *Mary Lou C. v. Ariz. Dep't of Econ. Sec.*, 207 Ariz. 43, 47, ¶ 8 (App. 2004).

¶13 The court may terminate parental rights under the fifteen-months' time in out-of-home placement ground if it finds that (1) "the child has been in an out-of-home placement for a cumulative total period of fifteen months or longer"; (2) "the parent has been unable to remedy the circumstances" that caused the out-of-home placement; and (3) "there is a substantial likelihood that the parent will not be capable of exercising proper and effective parental care and control in the near future." A.R.S. § 8-533(B)(8)(c). "Circumstances" means "those circumstances existing at the time of the severance that prevent a parent from being able to appropriately provide for his or her children." *Jordan C. v. Ariz. Dep't of Econ. Sec.*, 223 Ariz. 86, 96, ¶ 31 n.14.

¶14 Additionally, when seeking to terminate a parent's rights under the fifteen-months' time in out-of-home placement ground, DCS must show that it made a diligent effort to provide the parent with appropriate reunification services. A.R.S. § 8-533(B)(8)(c). "Diligent efforts" does not require DCS to undertake futile efforts to unite parents and children, but it does require DCS to "undertake measures [that have] a reasonable prospect of success." *Mary Ellen C. v. Ariz. Dep't of Econ. Sec.*, 193 Ariz. 185, 192, ¶ 34 (App. 1999). DCS must provide the parent "with the time and opportunity to participate in programs designed to help her become an effective parent." *Maricopa Cnty. Juv. Action No. JS-501904*, 180 Ariz. 348, 353 (App. 1994). However, DCS "is not required to provide every conceivable service or to ensure that a parent participates in each service" it offers. *Id.*; *Christina G. v. Ariz. Dep't of Econ. Sec.*, 227 Ariz. 231, 235, ¶ 15 (App. 2011). We "consider the availability of reunification services to the parent and [her] participation in those services." *Christina G.*, 227 Ariz. at 235, ¶ 14. In other words, when reviewing whether DCS has made diligent reunification efforts, the court must examine the "totality of the circumstances of the dependency." *Donald W. v. DCS*, 247 Ariz. 9, 26, ¶ 68 (App. 2019).

I. **Diligent Efforts**

¶15 Mother argues that DCS did not make diligent efforts to provide her with domestic-violence services that might have helped her avoid termination. Specifically, she asserts that the case manager was not diligent in communicating with her or her therapist about required therapy goals. The court found that DCS acted diligently and "Mother had plenty of time to start and make substantial progress in this area, but she still had

not begun domestic violence counseling as of the trial." Reasonable evidence in the record supports these findings.

¶16      The record shows DCS diligently informed Mother it expected her to obtain domestic-violence counseling. When the case began in May 2019, Mother told DCS she had private medical insurance, so the DCS investigator asked Mother to self-refer for domestic-violence counseling. A month later, the DCS case manager reiterated to Mother that she needed to self-refer for domestic-violence counseling, and in October, he sent Mother a service letter listing the counseling requirement. The case manager also listed the requirement in periodic court reports. Later, in October 2020, the court continued the termination hearing, and DCS again reminded Mother that she needed to participate in domestic-violence counseling. Yet, Mother did not start counseling until seventeen months after DCS first advised her to do so.

¶17      Mother argues that after she obtained a therapist in October 2020, the case manager waited a month to follow up with him and did not tell him Mother was required to address her domestic-violence issues. Although the case manager could have been more assiduous in communicating with Mother's counselor, he testified in November 2020 he tried to "provide [Mother's therapist] with the focus areas for domestic violence counseling" but received no response. Moreover, Mother testified she knew she needed to obtain domestic-violence counseling, but she did not inform her therapist of this requirement. Nor did she ask the counselor to address domestic violence until a month before the termination hearing.

¶18      Similarly, the record does not support Mother's assertion DCS and the court "disregarded the fact that [she] needed to be 30 days sober before starting individual counseling regarding trauma and domestic violence." From the outset of the dependency, DCS repeatedly referred Mother for substance-abuse services. To her great credit, Mother eventually achieved over five months' sobriety. Unfortunately, Mother had also waited over a year to actively participate in substance-abuse services, which delayed her sobriety and her decision to begin counseling.

¶19      Likewise, Mother's argument that DCS did not provide her with enough time to participate in domestic-violence counseling after September 2020 is unavailing. Mother had a year and a half to participate in services. *See Maricopa Cnty. Juv. Action No. JS-501568*, 177 Ariz. 571, 577 (App. 1994) (explaining the purpose of the out-of-home placement statute is to expedite permanency after a reasonable time and prevent children from lingering in DCS care "for as long as it takes their biological parents

to assume their responsibilities and take positive steps towards recovery"). Unfortunately, as the court found, Mother's own delay prevented her from making substantial progress in therapy by the time of the termination hearing. *See id.* at 577 ("Leaving the window of opportunity for remediation open indefinitely is not necessary, nor" is it in the children's best interests.).

**¶20**      Finally, Mother argues that after she had achieved 30 days' sobriety in August 2020, DCS did not refer her for a psychological evaluation, which "would likely have provided recommendations regarding individual counseling goals." But as the case manager testified, from the outset, DCS was "clear on what the current safety threat was"—domestic violence—which DCS directed Mother to address in therapy. On this record, we cannot say the court's diligent-efforts finding was clearly erroneous.

## II.      Fifteen-Months' Time In Out-of-Home Placement

**¶21**      Mother next argues insufficient evidence supports the court's findings that (1) she failed to remedy the circumstances causing the children's out-of-home placement, and (2) there was a substantial likelihood she would not be capable of exercising proper and effective parental care and control in the near future.

**¶22**      One of the main circumstances preventing the children's return was Mother's domestic-violence issues. Mother testified she was involved in domestic violence during a previous relationship, which eventually prompted her to end that relationship and obtain an order of protection. But her next relationship, with Boyfriend, also involved domestic violence. Mother testified she knew Boyfriend was a harmful influence on the children as early as 2018, but nevertheless remained with him. The children reported Boyfriend kicked, pushed, and shoved them, and they had witnessed numerous incidents of severe domestic violence between Mother and Boyfriend. Additionally, on the occasion that led to DCS taking custody of the children, they witnessed Boyfriend violently assault Mother, hold her at knifepoint for over two hours, and tell her "she was going to say her last good[]bye."

**¶23**      Mother testified she knew that to safely reunify with the children, she needed to confront her domestic-violence issues therapeutically. The case manager testified domestic violence causes children emotional trauma and places them at risk for physical harm. But Mother waited about seventeen months to begin counseling and had not addressed the topic of domestic violence by the termination hearing.

Considering these facts, the court found Mother had not remedied the issue of domestic violence, and reasonable evidence supports this finding.

¶24        The same evidence also supports the court's finding there was a substantial likelihood Mother would not be capable of exercising proper and effective parental care and control in the near future. By the time of trial, she had completed only two counseling sessions, both of which focused on her own childhood trauma. Mother's therapist testified he planned to address domestic violence with Mother at some undetermined point in the future, "[w]hen she's ready." And although Mother testified she was to start addressing domestic violence shortly after the termination hearing, both Mother and her therapist acknowledged that resolving those issues would be a long process.

¶25        Mother conceded at trial she would benefit from domestic-violence counseling because it would help her avoid repeating the domestic-violence cycle in the future. However, because she "had not even started [that process] at the time of trial," the court found it "ha[d] no evidence regarding her acknowledging her poor choices, developing strategies to avoid these types of toxic relationships in the future, and ultimately showing she can put the needs of her children ahead of her own." Overall, reasonable evidence supports the court's conclusion.

### III.    Best Interests

¶26        Finally, Mother challenges the court's finding that termination was in the children's best interests. Once the court finds a parent unfit under a statutory ground for termination, "the interests of the parent and child diverge," and the court proceeds to balance the unfit parent's "interest in the care and custody of his or her child . . . against the independent and often adverse interests of the child in a safe and stable home life." *Kent K.*, 210 Ariz. at 286, ¶ 35. "[A] determination of the child's best interest must include a finding as to how the child would benefit from a severance or be harmed by the continuation of the relationship." *Maricopa Cnty. Juv. Action No. JS-500274*, 167 Ariz. 1, 5 (1990). The court "must consider the totality of the circumstances existing at the time of the severance determination, including the child's adoptability and the parent's rehabilitation." *Alma S. v. DCS*, 245 Ariz. 146, 148, ¶ 1 (2018).

¶27        Here, the court found the children would benefit from termination in several ways. They had been living with their maternal grandmother throughout the dependency. They were bonded to her, and she was meeting their needs and wished to adopt them. The children, who

were both over twelve years old at the time of trial, wanted to remain with their maternal grandmother. Further, the case manager testified termination would give the children permanency and stability.

**¶28** The court also considered "the totality of the circumstances, including Mother's efforts toward reunification." Nonetheless, it found the children would suffer detriments if the parent-child relationship continued, given that Mother had not meaningfully addressed her domestic-violence issues and had not obtained stable housing. Reasonable evidence in the record supports each of the court's findings.

## CONCLUSION

**¶29** For the foregoing reasons, we affirm the order terminating Mother's parental rights to S.M. and F.M.[1]



AMY M. WOOD • Clerk of the Court
FILED: AA

---

[1] Because we affirm the order terminating Mother's parental rights under the fifteen-months' time in out-of-home placement ground, we need not address Mother's arguments regarding the neglect ground. *See Mary Lou C. v. Ariz. Dep't of Econ. Sec.*, 207 Ariz. 43, 49, ¶ 14 (App. 2004).